USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  5/31/22

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
                                                           :
    UNITED STATES OF AMERICA,                              :
                                                           :
                    -v-                                    :        1:20-cr-534-GHW
                                                           :
    JEFFREY HASTINGS,                                      :          MEMORANDUM
                                                           :        OPINION AND ORDER
                                        Defendant.  :
-----------------------------------------------------------X

GREGORY H. WOODS, United States District Judge:

## I.    INTRODUCTION

On August 13, 2021, Jeffrey Hastings pleaded guilty to two crimes arising from a complex

scheme developed by the defendant and his co-conspirators to mislead investors in SAExploration

Holdings, Inc. ("SAEX").  SAEX now seeks over $7,500,000 in restitution as a result of Mr.

Hastings' crimes.  Because the Court concludes, after scrutinizing the parties' submissions and the

billing records, submitted in connection with the restitution application, that not all of the fees

requested have been proven to have been were necessary as required under the Mandatory Victims

Restitution Act of 1996 (the "MVRA"), 18 U.S.C. § 3663A, SAEX is awarded restitution in the

amount of $7,363,129.34.

## II.    BACKGROUND

### a.  The Offense Conduct

Mr. Hastings engaged in a sophisticated criminal scheme designed to inflate the revenues of

SAEX, and to line his pockets—and those of his co-conspirators—with money.  As CEO of SAEX,

Mr. Hastings devised a series of shell companies that were used to "round-trip" funds that

dramatically inflated the reported revenue of SAEX.[1]  In the company's 10-K for 2015, it reported

---

[1] The Court outlined this scheme at sentencing.  *See* Dkt. No. 103 ("Sentencing Tr.") at 24:11-25:3 ("Mr. Hastings, with

$228,137,000 in revenue.  After Mr. Hasting's scheme was discovered and the company's books were restated, the company reported actual revenue of $171,344,000:  the effect of Mr. Hastings' fraud was to inflate the company's revenues by $56,793,000.  33.2% of the company's reported revenue was fake.  Mr. Hastings' crime had a similar effect on the company's reported revenues for 2016.  The restatement process revealed that of the company's $161,615,000 in reported revenues for that year, $43,949,000—or 27.2%—was false.  *See* Dkt. No. 103 ("Sentencing Tr.") at 23:25-25:11.  In 2016, Mr. Hastings and his co-conspirators engaged in a related scheme that allowed them to misappropriate for their own use some of the transferred funds.  Sentencing Tr. at 25:12-15.[2]

As CEO of SAEX, Mr. Hastings signed a series of certifications with respect to the company's SEC reports that he knew to be false.  Mr. Hastings engaged in that conduct over a period of years—between August 2016 and May 2019.  Dkt. No. 96 ¶ 33.  And the company's filings with the SEC during that period failed to disclose material information as a result of Mr. Hastings' crime and his decision to cover it up.  *Id.* ¶ 34.

The United States Securities and Exchange Commission (the "SEC") commenced an

---

his co-defendants, devised a plan to funnel money from SAE to ASV as 'fake equity.'  To do so, they created shell companies, including a company named Global Equipment.  Global Equipment invoiced SAE for fake equipment leases as a cover to justify payments by SAE to it.  Global Equipment in turn transferred money to other shell companies, including one owned by Mr. Hastings's wife and another long-term family friend, both of whom he involved through this mechanism in his criminal scheme.  They in turn transferred money to ASV – that is, the shell companies – who would send some of the money back to SAE, completing a 'round trip.'  By virtue of this round-tripping scheme, Mr. Hastings added a very large amount of fraudulent revenue to his company's returns . . . .  So this was not a simple scheme.  It was not a moment's bad decision.  It was a complex scheme which involved a lot of thought and work over a period of years.").

[2] "Again, I'll not describe all of the facts associated with this scheme because it's complex and the facts associated with it are undisputed, but in 2016, SAE books showed that the company owed this Global Equipment company millions of dollars in accounts payable.  While working out a way to restructure the company's obligations, Mr. Hastings and the co-conspirators developed a scheme that would have SAE pay those fake receivables in cash, then they would keep the proceeds. . . .  At the end of the day, Mr. Hastings and his co-defendants managed to manipulate the transfer of millions of dollars from SAE to Global Equipment. Lending proof to the adage that there is no honor among thieves, Mr. Hastings seemed to have been double-crossed by his co-defendant Mr. Whiteley, who controlled the Global Equipment accounts.  Mr. Hastings as a result got just under, in aggregate, $600,000 of the ill-gotten cash in the Global Equipment accounts.  His co-defendant, Mr. Whiteley, kept approximately $3.2 million, and Mr. Hastings received $590,000 as a result of this scheme.  It should go without saying that I appreciate that Mr. Whiteley double-crossed Mr. Hastings, but I don't feel bad about that.  There's no fair share of stolen money." Sentencing Tr. at 25:15-26:17.

investigation into the company.  SAEX received letters from the SEC informing it that the SEC's

Division of Enforcement was conducting an investigation of the company in November 2018 and

November 2018.  Sentencing Tr. 27:7-8.  "In August 2019, so over a year and a half after notice of

the investigation by the SEC, there was a board meeting at which Jones Day updated the board

regarding the investigation.  As counsel for the United States alluded to, that same day Mr. Hastings

met in a hotel in Toronto with his co-defendants and another co-conspirator.  There, they talked

about what they would tell Jones Day about the 12 million pointlessly drained from SAE.  Hastings

developed a lie about saying that the payment was made as a consideration for a 2011 contract

assignment.  It was not.  Then Mr. Hastings cooked up fake, backdated documents to bolster his

story and then had those presented to the SEC through counsel in response to a subpoena."  *Id.* at

27:14-25.

   **b.  The Restatement**

  On August 15, 2019, SAEX issued a press release stating that it planned to restate its

previously-issued financial statements for the fiscal years ended December 31, 2015 through 2018,

and for the quarters ended June 30, 2015 through March 31, 2019.  Dkt. No. 96 at ¶ 39.  The press

release stated that the company's decision to restate "arose from the Company's re-evaluation of its

relationship with [ASV]"—a vehicle used by Mr. Hastings to commit his offenses.  The company

did restate its financial statements as a result.

  Among the filings made by the company was a Form 10-K/A—an amended disclosure for

fiscal year 2018—which was filed on February 7, 2020 (the "Amended 10-K").  The Amended 10-K

states that the board's decision "to restate our consolidated financial statements for the Non–

Reliance Periods arose from our re–evaluation of our relationship with Alaskan Seismic Ventures,

LLC ('ASV'), which had not been consolidated into our financial statements."  Amended 10-K at (i).

The Amended 10-K also describes the formation of a special committee in August 2019 "to oversee

an internal investigation with respect to the SEC investigation and any related matters." *Id.*

In addition to the criminal conduct of Mr. Hastings, the Amended 10-K states that the company's special committee uncovered a separate crime by Mr. Whiteley, the company's general counsel, who also participated in Mr. Hastings' offenses. "The Special Committee's investigation also identified the misappropriation of approximately $4.1 million by Mr. Whiteley from 2012 to 2019, which amount has been reclassified in our consolidated statement of operations as a loss from a misappropriation of funds for such periods. A portion of these funds were paid to RVI Consulting, Inc. ('RVI'), a legal entity owned and/or controlled by Mr. Whiteley. The payments made to RVI were not disclosed. The majority of the payments to RVI were previously recorded as legal and professional expenses in the prior periods." *Id.* at (ii).

### c. The Criminal Investigation

The United States began an investigation of potential criminal conduct at SAEX. On or about October 10, 2019, the prosecution team informed Sidley Austin LLP ("Sidley"), counsel for SAEX, that it had commenced an investigation, and that the scope of the criminal investigation was similar in scope to the SEC investigation . . . ." Dkt. No. 127-1 (the "Government Affidavit") at ¶ 3. Over the course of the investigation, the prosecution team made a number of requests to SAEX through their counsel. In their first request made on October 10, 2019, the "Prosecution Team requested that Sidley make a presentation to the Prosecution Team regarding facts that Sidley and SAE's prior outside counsel had learned in the course of their internal investigation into potential criminal conduct at SAE." *Id.* By its terms, the Government did not request that Sidley conduct an investigation, or conduct any particular work in connection with the investigation, but, rather, to report on the information that Sidley "had learned" in the course of the company's internal investigation.

The Government made a number of similar requests over the course of its investigation.

For example, in November 2019, the "Prosecution Team requested that Sidley give a presentation to the Prosecution Team regarding the facts underlying SAE's forthcoming amended annual and quarterly reports, which included restated financial statements . . . that SAE was preparing as a result of the misconduct by Hastings and his coconspirators." *Id.* at ¶ 5.  Here too, the Government did not request that the company conduct specific research, but to report on work that it was already doing to support the restatement of the company's financial statements.  The prosecution team made a similar request in January 2020, asking Sidley to "make a presentation to the Prosecution Team concerning facts that Sidley *had learned* in the process of preparing the Restatement . . . ." *Id.* at ¶ 8 (emphasis added).

The Government also requested that the company provide it with a number of documents, and that it make some individuals available for interviews.  Only one of those witnesses was represented by Sidley during the interview.  *Id.* at ¶ 12.

### d.  Procedural History

Mr. Hastings was charged in a four count indictment issued in this district on October 8, 2020.  Dkt. No. 3.  On February 16, 2021, the Court entered an order scheduling Mr. Hastings' trial for October of the same year.  A superseding indictment was returned on March 16, 2021.  Dkt. No. 34.  Then Mr. Hastings' co-defendants started to enter guilty pleas:  Mr. Whiteley waived indictment and pleaded guilty on May 17, 2021.  Dkt. No. 41.  Michael Scott did the same on May 26, 2021.  Dkt. No. 51.  After several months, during which the parties prepared for trial, Mr. Hastings too pleaded guilty to two charges contained a new superseding information.  Dkt. No. 91.  Mr. Hastings pleaded guilty to conspiracy to commit securities fraud, to make false filings with the SEC, and to make false statements to auditors, in violation of 18 U.S.C. § 371; and conspiracy to commit wire fraud, in violation of the same statute.

The Court sentenced Mr. Hastings on November 15, 2021.  The Court principally sentenced

Mr. Hastings to 36 months of incarceration.  The Court also imposed a fine and entered an order of forfeiture.  Dkt. No. 102.  The Court reserved resolution of the issue of restitution, however, to permit the victims to present substantive briefing in support of their request to the Court. Sentencing Tr. 40:5-42:13.

SAEX filed a letter brief regarding the amount of its purported losses on December 17, 2022.  Dkt. No. 105.  The amount requested totaled $10,838,844.30.  *Id.* at 7.  The majority of that amount was the amount of "direct" losses suffered by SAEX—the amount of cash taken from the company and never returned.  The application requested that the Court award it the amount of its direct losses.  SAEX also requested that the Court award it $1,266,479.10—representing the amount, it represented, that the company had spent to restate its financial statements as a result of the Mr. Hastings' crimes.

SAEX also requested that the Court order Mr. Hastings to pay it $3,303,240.89 for what the company described as its expenses incurred responding to and assisting the Government and the Court.  *Id.* at 5-6.  SAEX emphasized in its application that it was not seeking reimbursement of its legal fees for all work completed as a result of Mr. Hastings' crimes.  It did not seek fees prior to the United States' first outreach in October 2019, including the costs associated with responding to the SEC's investigation, which, as described above, launched in 2017.  SAEX also stated in its letter briefing that it was not pursuing nearly $4 million in attorneys' fees incurred to "sustain operations in light of Hastings' and his co-conspirators' actions."  *Id.*  SAEX presented the billing records that supported its application, and stated that the billing records presented to the Court for reimbursement were only those in which the company had "identified the tasks and activities within this matter that were undertaken by SAE's attorney's in response to the Government requests related to the investigation and prosecution of this case" and that the company had "removed time entries that do not include work directly related to those tasks and activities."  *Id.*

Mr. Hastings filed an opposition to SAEX's application on January 10, 2022.  Dkt. No. 111. In it, Mr. Hastings conceded that he was liable for $6,221,958 in losses, as well as $47,166.30 in legal fees related to the preparation of the application for restitution.  However, Mr. Hastings challenged the company's claims for restitution with respect to the other categories of losses pursued by the Company.  First, Mr. Hastings challenged the company's claim for reimbursement of costs associated with the restatement of its financial statements. *Id.* at 2-7.  Mr. Hastings argued that the company could not pass on the costs of the restatement to Mr. Hastings because "a restatement was required even without the impact of Mr. Hastings' conduct." *Id.* at 4.  Mr. Hastings claimed that a restatement would have been required as a result of Mr. Whiteley's separate crime in any event: "SAE uncovered during its restatement process that Mr. Whiteley, the former CFO and General Counsel, had been creating fraudulent invoices and stealing from the company over a seven-year period—a discovery that certainly would have called for extensive additional scrutiny of historical financials." *Id.* at 4-5.  Second, Mr. Hastings pointed to the lack of support for the conclusion that the amount charged in specific invoices presented by the company related to the restatement and Mr. Hastings' offense. *Id.* at 5-7.

The opposition took particular aim at SAEX's request for $3.3 million in legal fees and expenses.  Mr. Hastings's brief reminded SAEX of the relevant standard—namely that the cost of internal investigations was not compensable under the MVRA and that the company was obligated to demonstrate that its fees were "incurred as part of its participation in the Department of Justice investigation or criminal proceeding" and that the costs were directly and proximately caused by the defendant's criminal conduct. *Id.* at 7-8.  Mr. Hastings pointed to large swaths of the billing records presented by Sidley, which on their face, did not appear to have been requested by the Government—such as presentations to the company's own board of directors.  Expenses that were not incurred in response to a request by the Department of Justice, Mr. Hastings argued, were not

properly compensable under the MVRA.

In its January 17, 2022 reply, SAEX agreed not to pursue certain of its requests for reimbursement in connection with the restatement.  Dkt. No. 113.  SAEX provided additional argument regarding why those expenses were appropriate, but did not support any of the additional facts presented in its letter briefing with an affidavit or affirmation.  SAEX doubled down on its position with respect to its claim for $3.3 million in legal fees pursuant to the MVRA, providing annotated copies of their billing records to the Court for review.

The Court reviewed the parties submissions and was unable to conclude that the billing records presented by SAEX justified the company's claim for $3.3 million in restitution for its legal expenses.  The billing records contained several categorical descriptions of the work done for each block of time billed, but relatively few of those descriptions showed that the work was done at the request or incitement of the Department of Justice.  The time records contained categorical descriptions that specifically referred to requests by the Department of Justice, such as the following:  "Respond to DOJ Questions and Requests," "January 22, 2022 Presentation to DOJ," "March 4, 2020 Presentation to DOJ."  But the records contained many other categories that were not directly tied to requests by or presentations to the Department of Justice, such as the following: "Fact Development," "Document Review and Production," "Witness Interview Preparation." Many billing entries were block billed and were described using both a billing category that indicated a request by the DOJ and a more generic category, such as "Respond to DOJ Questions and Requests Fact Development."  Where that was the case, SAEX asked to be reimbursed for the full amount of the relevant entry without distinction for the time described as having been a response to "DOJ Questions and Requests," and that which was merely "Fact Development."

Moreover, the billing records submitted by SAEX made it clear on their face that entries that did not specifically state that they were responses to requests from the Department of Justice were

not the result of requests by the Department of Justice.  For example, SAEX requested reimbursement for many thousands of dollars working on a presentation to the company's board of directors.  Those billing records were described as "Fact Development" and as "Document Review and Production."  The Court, like Mr. Hastings, was skeptical that the Department of Justice had requested that the company make a presentation to its own board of directors.  The Court was unable to ascertain from the billing records alone what costs were properly compensable under the MVRA, and was concerned that the request made by the company was inconsistent with the governing law.

As a result, the Court scheduled a conference to discuss its concerns regarding the company's request for reimbursement of attorneys' fees.  The conference took place on February 24, 2022.  Dkt. No. 123 ("Restitution Tr.").  To frame the conversation, the Court reminded the parties of the limitations on the reimbursement of attorneys' fees set forth by the Supreme Court in *Lagos*. *Id.* at 6:5-23.  The Court noted that "there's a substantial volume of the time records as to which it's not apparent to me that you have proven that the time incurred was incurred at the invitation or request of the government, as opposed to . . . an independent investigation by SAE." *Id.* 6:19-23. The Court asked counsel for SAEX if "all of the fees that you have provided here for the Court to consider for reimbursement of fees that were incurred at the invitation or request of the government . . . ?" *Id.* at 7:17-20.  Counsel did not respond concretely to the question, instead providing a description of the ways in which the company had curtailed its request for fees, including by removing fees incurred before the government began its investigation and removing certain time entries.  She also explained that to provide full answers to the government, the company needed to understand what the facts where.

Since the company asserted that all of the work for which it had presented billing records had been done at the request of the Government, the Court then turned to counsel for the United

States for confirmation of the company's representation.  And the Government affirmed that it had

requested that the work reflected in the billing records be completed.

>THE COURT:  Let me turn to you, Ms. Magdo.  Ms. Magdo, SAE is saying
>that the government made specific requests or invited them to do work that cost the
>company $3 million.  I haven't heard from the government to what extent you
>requested or invited the work that's outlined here in their fee request, which as I
>have described it, includes a substantial number of internal interviews, interview
>outlines, document binders related to those and other what is described in the billing
>records as 'fact development,' as well as witness interview preparation.
>
>Counsel for the United States, did the government request that the defendant
>undertake that internal investigation?
>
>MS. MAGDO.  *Yes, your Honor.*  I think it would be helpful to take a step
>back to help set the scene here.  The government made its investigation known to
>SAE in the fall of 2019.  But by that point, there had already been an SEC
>investigation known to the company for well over a year.  And the company had
>done a lot of work, it is my understanding, in response to the inquiry from the SEC
>prior to the Government's approach of the company.  And my understanding is that
>that work is not included in the company's . . . .

Restitution Tr. 15:12-16:8 (emphasis added).

Despite the Government's oral assertion to the Court that it had requested that SAE

undertake an internal investigation, such that all of the $3.3 million of work requested by the

company could be properly claimed under the MVRA, the Court remained skeptical.  As a result, the

Court requested that the Government submit a sworn affidavit to support its assertion.  "If the

government is affirming that the information that the work that was done by SAE's counsel here

was done at the invitation or the request of the government, I'll just ask you to submit an affidavit to

that effect."  *Id.* at 16:14-17.  The Court directed that the parties review the billing records with the

governing law—and the Government's sworn affirmation regarding the scope of their requests to

the company—in mind.

The day after the conference, the Second Circuit handed down its decision in *United States v.*

*Afriyie*, 27 F.4th 161 (2d Cir. 2022).  In it, the Second Circuit confirmed that the cost of responding

to an SEC investigation could not be claimed as restitution under the MVRA.  The same day, the

Court issued an order directing that SAEX's supplemental submissions respond to the Circuit's ruling in *Afriyie*.  Dkt. No. 122.

In response to the Court's direction that the Government support its affirmation regarding the scope of the work that the Government had requested or invited that the company do, the Government submitted the Government Affidavit.  As outlined above, perhaps moderated by the requirement that its representations to the Court be sworn out in an affidavit, the Government no longer took the position that all $3.3 million dollars in fees requested by SAEX resulted from a request by the Government, or that the Government had requested that the company undertake an internal investigation.  Instead, the Government described a series of specific requests directed to the company for presentations, documents and witness interviews.  With respect to the requested presentations, the Government affirmed that it requested that the company make presentations "regarding facts that Sidley and SAE's prior outside counsel *had learned* in the course of *their* internal investigation."  Government Affidavit at ¶ 3 (emphasis added).  Thus the Government does not aver that it requested that the company conduct an internal investigation, or that the Government directed such an investigation—instead, in the careful language of the affidavit, the Government asked for the company to present on information that it had already learned during the company's own internal investigation.

Now bounded by the Government's affidavit regarding the nature of the requests made by it, SAEX's supplemental request for reimbursement of attorney's fees was much more limited:  the company now seeks $368,818 in attorneys' fees, rather than the more than $3.3 million previously requested.  Dkt. No. 128.  SAEX proffered a new exhibit 14 describing all of the tasks worked at the request of the Department of Justice.  That exhibit is broken into several subsections, each of which relates to a specific request or set of requests, such as the "January 22, 2022 Presentation to the SDNY," or "the March 4, 2020 Presentation to the SDNY."  The company's updated request is now

directly tethered to requests by the United States.

However, SAEX's billing records are still plagued by block billing. And the block billed entries include time that SAEX now concedes was not billed to respond to requests by the United States. For example, one billing entry might state something like "Review and revise memo, conference with John Smith; calls and meetings with Jane Smith; review and revise powerpoint" as the explanation for $3,010.00 in billed time. But of those four tasks, only one, the company asserts, was dedicated to responding to a request to the Government. To allocate time to the compensable task, SAEX has simply counted the number of tasks included in each billing entry and divided the total bill by the number of tasks to estimate the cost of each task. So, in the example above, the biller performed four tasks—each task is ascribed a value of ¼ the total amount, or $752.50. In its letter to the Court, SAEX's counsel asserts that they have done that for each time entry to estimate the amount of time worked on tasks that were responsive to Government requests. But SAEX has not presented any affidavits in support of its request, or its application of the methodology described to its billing records. Nor has it provided any statement regarding whether or not the methodology applied yields a fair approximation of the amount of time spent on projects requested or invited by the United States. As a result of the company's election not to provide the Court with supporting affidavits, the Court has no detailed information regarding how the work included in block billed entries was allocated.

Mr. Hastings' opposition to the supplemental request for attorneys' fees by SAEX took aim at the issues caused by its counsel's block billing. Dkt. No. 130. First, Mr. Hastings argued that the methodology used by SAEX to separate time billed on tasks that were not requested from the government as outlined above was arbitrary. "The problem SAE faces in isolating time entries that satisfy the applicable standard is that many of its entries comingled recoverable and non-recoverable tasks. Of the approximately 325 block entries that contain at least one recoverable task, 136 of

those block entries also include a task SAE admits is not recoverable. The 136 entries with non-recoverable tasks represent roughly 50% of the $368,818.88 in legal fees requested by SAE in Exhibit 14. In other words, SAE can only identify roughly $134,000 in time entries that only contain work it claims is recoverable under Second Circuit precedent." *Id.* at 3.

Mr. Hastings argued that the appropriate approach to differentiate tasks laid out block-billed timesheets was to present detailed affidavits explaining the differentiation, and that the alternative approach used by SAEX's counsel was purely arbitrary. "SAE offers no expert testimony and points to no other example of its 'methodology' being accepted by courts to untangle block billing. SAE also does not explain why it did not anticipate the need for isolated time entries, as identified in Avenatti, or what prevents its timekeepers from submitting declarations." *Id.* at 4.

Mr. Hastings' opposition also noted that SAEX's supplemental request did not differentiate between the time spent responding to requests that were associated with Mr. Whiteley's independent crimes. "SAE's submission concedes that each of the presentations to the USAO for which SAE is seeking restitution included a discussion of Mr. Whiteley's independent embezzlement scheme and thefts, and that across two subsequent presentations to the USAO, just over one in ten slides dealt with this separate issue." *Id.* at 5. "The simple fact is that these presentations plainly required SAE to incur legal fees discussing and analyzing uncharged conduct that had no relationship to Mr. Hastings's offense. These costs are not the direct and proximate result of the offense." *Id.*

## III.   LEGAL STANDARD

The MVRA provides that a sentencing court "shall order" defendants convicted of specified crimes, including "an offense against property under this title . . . , including any offense committed by fraud or deceit," to "make restitution to the victim[s] of the offense" in addition to "any other penalty authorized by law." 18 U.S.C. §§ 3663A(a)(1); (c)(1)(ii). Under the statute, a "'victim' means a person directly and proximately harmed as a result of the commission of an offense for which

restitution may be ordered." *Id.* § 3663A(a)(2). "Thus, in determining to whom a defendant owes restitution, the statute requires the court (1) to identify the 'offense' of conviction and (2) to ascertain whether the putative 'victim' was 'directly and proximately harmed' by the defendant's commission of that 'offense.'" *United States v. Goodrich*, 12 F.4th 219, 228 (2d Cir. 2021). Not all harms caused by a defendant's offense are compensable under the MVRA—only those articulated in the statute. *United States v. Maynard*, 743 F.3d 374, 379 (2d Cir. 2014) ("If Congress intended to include all harms directly and proximately caused by a defendant's offense, it could have done so with wording more simple and categorical.").

"[R]estitution may be imposed only for losses arising from "'the specific conduct that is the basis of the offense of conviction.'"" *United States v. Goodrich*, 12 F.4th at 228 (quoting *United States v. Vilar*, 729 F.3d 62, 97 (2d Cir. 2013)). In the context of a criminal conspiracy, restitution is not limited only to "losses caused by the actions of that defendant during the conspiracy, but also embraces losses flowing from the reasonably foreseeable actions of that defendant's co-conspirators." *Id.* (internal quotation marks and citations omitted). The "MVRA requires that the 'offense' of conviction 'directly and proximately harmed' the victim entitled to restitution. Courts have interpreted this language to impose cause-in-fact and proximate cause requirements, respectively." *Id.* at 229. "Regarding cause in fact, the defendant's conduct must have been a necessary factor in bringing about the victim's harm." *Id.* Regarding proximate cause, the "'basic question . . . is whether the harm alleged has a sufficiently close connection to the conduct,' which we evaluate based on whether that harm was 'foreseeable' to the defendant." *Id.* (quoting *Robers v. United States*, 572 U.S. 639, 645 (2014)).

In a case involving loss or destruction of property, the MVRA provides that an order of restitution "shall require" the defendant to return the lost property or "if return of the property . . . is impossible, impracticable, or inadequate, pay an amount equal to- (i) the greater of- (I) the value of

the property on the date of damage, loss, or destruction; or (II) the value of the property on the date of sentencing, less (ii) the value (as of the date the property is returned) of any part of the property that is returned.  18 U.S.C. § 3663A(b)(1)(B).  "Thus, the MVRA unambiguously tells a court what to value (the property lost; the property returned) and even when to value it (in the case of the loss value, property is evaluated 'on the date of the damage, loss, or destruction,' or 'on the date of sentencing,' whichever is greater . . . .)."  *United States v. Boccagna*, 450 F.3d 107, 114 (2d Cir. 2006) (internal citations omitted).

Because the statute is silent regarding how the referenced property is to be valued, "the law appears to contemplate the exercise of discretion by sentencing courts in determining the measure of value appropriate to restitution calculation in a given case."  *Id.*  Thus, the Second Circuit construes "'value' as used in the MVRA to be a flexible concept to be calculated by a district court by the measure that best serves Congress's statutory purpose."  *Id.* at 115.  "In determining the appropriate measure of value for property relevant to restitution, a district court must consider that the purpose of restitution is essentially compensatory:  to restore a victim, to the extent money can do so, to the position he occupied before sustaining injury."  *Id.*  "In most circumstances, fair market value will be the measure most apt to serve this statutory purpose."  *Id.*  "Notwithstanding the general reliability of fair market value as a measure of property value, in some circumstances other measures of value may more accurately serve the statutory purpose to ensure a crime victim's recovery of the full amount of his loss."  *Id.* at 116.  A court may grant an award of pre-judgment interest where appropriate to compensate a victim for its losses.  *See United States v. Qurashi*, 634 F.3d 699, 703 (2d Cir. 2011).

The statute mandates that the court "order restitution to each victim in the *full amount* of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant."  18 U.S.C.A. § 3664(f)(1)(A) (emphasis added).  "However, the

award cannot "allow[ ] a victim to recover more than his due." *United States v. Qurashi*, 634 F.3d at 703.

In addition to compensating the victim for the value of property lost or damaged, the MVRA also requires defendants to "reimburse the victim for lost income and necessary child care, transportation, and other expenses incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense." *Id.* § 3663A(b)(4). In *Lagos v. United States*, the Supreme Court held that the words "investigation" and "proceedings" in section 3663A(b)(4) of the MVRA "refer to government investigations and criminal proceedings." 138 S. Ct. 1684, 1690 (2018).[3] In *United States v. Afriyie*, 27 F.4th 161 (2d Cir. 2022), the Second Circuit narrowly construed the statute to "hold that restitution is appropriate only for expenses associated with criminal matters. Civil matters—including SEC investigations, even if closely related to a criminal case—do not qualify."

The *Lagos* Court concluded that the MVRA "does not cover the costs of a private investigation that the victim chooses on its own to conduct." *Lagos*, 138 S. Ct. at 1690. "*Lagos* thus 'limit[s] restitution to expenses incurred for investigatory activities that the government expressly and specifically invited or requested.'" *United States v. Avenatti*, No. (S1) 19 CR. 373 (PGG), 2022 WL 452385, at *5 (S.D.N.Y. Feb. 14, 2022) (quoting *United States v. Napout*, No. 15-CR-252 (PKC),

---

[3] In *Lagos*, the Court adopted a narrow construction of the terms "investigation" and "proceedings." As part of its analysis, the Court expressed concern that the adoption of a broad construction of those terms "would create significant administrative burdens." *Lagos*, 138 S. Ct. at 1689. The Court went on to describe the difficulties associated with a district court's analysis of whether "particular expenses 'incurred during' participation in a private investigation, or attendance at, say, a bankruptcy proceeding were in fact 'necessary.' Such disputes may become burdensome in cases involving multimillion dollar investigation expenses for teams for lawyers and accountants. A district court might, for example, need to decide whether each witness interview and each set of documents reviewed was really 'necessary' to the investigation." *Id.* The Court expressed doubt "whether Congress intended, in making this restitution mandatory, to require courts to resolve these potentially time-consuming controversies as part of criminal sentencing . . . ." As this case illustrates, the Court was prescient. As indicated above, the quotation is embedded in an explanation regarding why the adoption of a broader reading of the terms "investigation" and "proceedings" would be even more administratively burdensome; it does not relieve the district courts from undertaking an analysis of whether costs were "necessary" applying the Court's limited construction of those terms. *Lagos* limited but did not eliminate what is, indeed, a significant administrative burden on the district courts in the context of a heavily lawyered case, such as this.

2018 WL 6106702, at *4 (E.D.N.Y. Nov. 20, 2018)).  In light of the Second Circuit's decision in *Afriyie*, the government agency inviting or requesting the investigatory activities must be part of the criminal prosecution team, not the SEC or another civil investigatory agency.

A victim may recover attorney's fees that it incurred while helping the government investigate and prosecute a defendant.  *United States v. Afriyie*, 27 F.4th at 163; *see also United States v. Amato*, 540 F.3d 153, 161 (2d Cir. 2008), *abrogated on other grounds by Lagos v. United States*, 138 S. Ct. 1684, 201 L. Ed. 2d 1 (2018).  However, for a victim to recover such fees, "the statute's other strictures" must be met.  *U.S. v. Afriyie*, 27 F.4th at 163.  "This Court concludes that restitution under the MVRA is available for attorneys' fees incurred in connection with services that were invited, required, requested, or otherwise induced by the Government."  *United States v. Avenatti*, 2022 WL 452385, at *8 (collecting cases).

"[T]he MVRA requires only a reasonable approximation of losses supported by a sound methodology.  As explained by the First Circuit, 'the preponderance standard must be applied in a practical, common-sense way.  So long as the basis for reasonable approximation is at hand, difficulties in achieving exact measurements will not preclude a trial court from ordering restitution.'"  *United States v. Gushlak*, 728 F.3d 184, 196 (2d Cir. 2013) (quoting *United States v. Savoie*, 985 F.2d 612, 617 (1st Cir. 1993)).  The government bears "[t]he burden of demonstrating the amount of the loss sustained by a victim as a result of the offense" and "any dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence."  18 U.S.C. § 3664(e).[4]

---

[4] The Court pauses to address the issue of the timeliness of the restitution award.  Title 18 U.S.C. § 366(A)(d)(1)(5) provides that, "[i]f the victim's losses are not ascertainable by the date that is 10 days prior to sentencing, the attorney for the Government or the probation officer shall so inform the court, and the court shall set a date for the final determination of the victim's losses, not to exceed 90 days after sentencing."  The Court sentenced Mr. Hastings on November 15, 2021; therefore, under § 366(A)(d)(1)(5), the Court was required to reach a final determination of SAEX's losses no later than February 14, 2022.  The Second Circuit has explained that the purpose behind the statutory 90-day limit on the determination of a victim's losses is not to protect defendants from drawn-out sentencing proceedings or to establish finality; rather, it is to protect crime victims from the willful dissipation of defendants' assets." *United States v.*

## IV.   DISCUSSION

### a.   Direct Losses

Mr. Hastings does not contest SAE's status as a victim under the MVRA.  Nor does he challenge the principal amount of the company's direct losses.  The Court agrees that the evidence presented to the Court establishes that the direct amount of that loss is $6,221,958.  This is the amount of money that was sent to Global Equipment, a shell company controlled by Hastings, that was not ultimately routed back to the company.  Dkt. No. 105 at 4.

### b.   Losses Associated with Cost of Restatement

Mr. Hastings must reimburse the company for the documented cost of restating its financial statements.  The loss incurred by the company in restating its financial statements was directly caused by Mr. Hasting's fraud.  The restatement itself says as much:  the "decision to restate [the Company's] consolidated financial statements . . . arose from [the Audit Committee's and the Board's] re–evaluation of our relationship with Alaskan Seismic Ventures, LLC," a vehicle used to implement Mr. Hasting's fraudulent scheme.  *See* Form 10-K/A at (i).

Mr. Hastings' fraud inflated the revenues of the company for 2015 and 2016 by a very large amount—indeed, that was one purpose of the fraud.  The company's revenue was inflated by almost $57 million in 2015 and by almost $44 million in 2016.  Sentencing Tr. at 24:24-25.  "To put those numbers in context, in 2015, 33.2 percent of SAE's reported revenue was just plain fake.  In 2016,

---

*Douglas*, 525 F.3d 225, 252 (2d Cir. 2008).  Therefore, "an extension of the proceedings beyond the 90-day period provides no basis for vacating the restitution order unless the defendant can show that the extension caused him actual prejudice." *Id.* at 252-53.  As explained above, the parties completed initial briefing on the restitution issue on January 17, 2022.  In response to concerns Mr. Mr. Hastings raised in the Opposition and in an effort to fashion an accurate restitution award, the Court requested supplemental filings from the Government and the parties, which were not fully submitted until March 18, 2022.  As a result of the time consumed by the submission of these supplemental filings, and the Court's review of them the Court did not calculate SAEX's losses within the 90-day period described in § 366(A)(d)(1)(5).  To the extent Mr. Hastings contends that he has experienced "actual prejudice" as a result of the delay, he is directed to file a supplemental submission describing the basis for the asserted prejudice.  Any supplemental submission is due no later than June 8, 2022.

27.2 percent of the company's reported revenue was fake.  The numbers that the public and investors were seeing were substantially misstated." *Id.* at 25:7-11.  The company was required to restate its financials because of Mr. Hasting's massive fraud.  It was certainly reasonably foreseeable that the crime, once discovered, would require the restatement of the company's financial statements.  The associated losses were directly and proximately caused by Mr. Hasting's crime.

Because Mr. Hastings' offense was the direct and proximate cause of the company's restatement, the Court rejects Mr. Hastings' argument that he should be excused from any obligation to reimburse the company for the cost of restating its financial statements because the review of the company's financial documentation provoked by Mr. Hastings' crime exposed a separate theft by a co-defendant.  Mr. Hastings asserts that "SAE uncovered during its restatement process that Mr. Whiteley, the former  CFO and General Counsel, had been creating fraudulent invoices and stealing from the company over a seven-year period-a discovery that certainly would have called for extensive additional scrutiny of historical financials.  There has never been any allegation that Mr. Hastings was involved in this misconduct."  Dkt. No. 111 at 5.

Mr. Hasting's argument rests on a sound legal foundation—to be compensable under the MVRA a loss must be directly and proximately caused by the defendant's offense.  As a result, if the cost of the restatement was proximately caused by Mr. Whiteley's separate crime, and not that of Mr. Hastings, it would be inappropriate to charge Mr. Hastings for the cost of the restatement.  The argument, however, is not tenable given the facts of this case.  The amount stolen by his co-defendant over the seven year period from 2012 to 2019 is stated to be $4.1 million—an average of approximately $585,714 a year.  *Id.* at 4.  From this factual predicate, Mr. Hastings argues that "[t]he existence of this unrelated, intervening cause for a restatement means that SAE cannot establish that the restatement would not have been necessary without Mr. Hastings's conduct." *Id.* at 5.

The theft by Mr. Hastings' co-defendant was not an intervening cause of the restatement.

19

The facts presented by Mr. Hastings makes this quite clear—Mr. Hastings states that the theft was discovered by SAEX "during its restatement process"—the reexamination of the company's financials required as a result of Mr. Hastings' fraud uncovered the separate theft.  Dkt. No. 105 at 4.  The theft did not cause the restatement.  Therefore, it was not the proximate cause of the restatement.

Moreover, the amount involved in the theft was small relative to the impact of Mr. Hastings' fraud:  the theft involved $4.1 million dollars over the course of seven years; Mr. Hastings' fraud inflated the company's revenues by over $100 million dollars in two.  Mr. Hastings argues that the $4.1 million tail wagged the $104 million dog.  But the argument is logically incoherent here.  The numbers reveal that the impact of Mr. Hastings' criminal conduct on the company's financial statements comprised the dog and most of the tail.  The chronology, as well as the statements contained in the Amended 10-K regarding the instigation of the restatement, make it clear that the reexamination of the company's financial statements was required as a result of Mr. Hastings' conduct.  Mr. Hastings' crime was the proximate cause for the restatement.  That another issue surfaced during the review required as a result of Mr. Hastings' crime does not break the chain of proximate causation.[5]

[5] It is reasonably foreseeable that the restatement process initiated as a result of the defendant's criminal conduct might unearth other needed adjustments in addition to those caused by the defendants' crime—therefore the costs of addressing those unrelated issues is properly attributable to the defendant's conduct.  For better or worse, but for the triggering event of the defendant's crime, those issues might never have surfaced.  Just as the tortfeasor who injures a plaintiff with the proverbial eggshell skull is responsible for all of the consequences of her tort, so too here:  Mr. Hastings' crime broke the company's financial statements, and he is responsible for the full consequences of repairing the resulting harm.  To the extent that the defendant argues that the Court is required to apportion from the restatement costs those that relate specifically to Mr. Whiteley's crime, the Court rejects the assertion for two reasons.  First, as described above, Mr. Hastings' crime was the proximate cause of the restatement.  Second, it would be very impractical to attempt to review each and every task conducted by those involved in the restatement process to determine which specifically related to Mr. Whiteley's crime.  Loss calculation need not be perfect dollar-for-dollar—it must only be a reasonable approximation.  As described above, the amount allegedly involved in Mr. Whiteley's crime was less than 5% of the aggregate amount of revenue inflation resulting from Mr. Hastings' crime and occurred over a longer period.  If the Court were to apportion the costs of the restatement based on the principal amount of the amount at issue, it would have Mr. Hastings responsible for over 95% of the costs, not far from the 100% for which the Court has determined he is liable.

Mr. Hastings must pay $788,129 to compensate SAEX for this category of losses.  SAEX has presented the invoices of the service providers that worked with the company in connection with the restatement.  They are:  Ankura, a forensic accounting firm that assisted the company with its restatement; Ham, Langston & Brezina, which provided Chief Financial Officer services to the company and worked on the restatement; Porter Hedges LLP, a law firm that provided legal advice regarding the restatement; and Pannell, Kerr & Foster, an auditing firm.  Dkt. No. 113 at 6.  The Ankura invoices relate to work on the restatement in from October through December 2019.  The company proffers that the period at issue was "when the Company was working intensively to respond to the S.D.N.Y. investigation and to prepare the Restatement that would be filed on February 7, 2020."  *Id.*  While the bills are redacted, they do reflect time billed on the restatement and "analysis of transactions"—which the Court understands to refer to Mr. Hastings' illegal schemes.  As a result, the Court concludes that those amounts are properly included in the loss calculation.  The legal fees billed by Porter Hedges related directly to the restatement, as described in them.  Mr. Hastings takes issue with these invoices because they do not subdivide time spent reviewing issues caused by Mr. Whiteley's independent theft.  But for the reasons set forth above, that argument does not justify a reduction in the loss amount caused by Mr. Hastings' crime.

SAEX is entitled to reimbursement for expenses incurred by Pannell, Kerr & Foster.  SAEX requests reimbursement for $331,749 of the $1,266,479.10 billed by Pannell, Kerr & Foster, which reflects the portion of the firm's billing that expressly references the restatement.  This amount reflects a substantial reduction from the amount originally requested by SAEX.  Portions of the original request were criticized by counsel for Mr. Hastings as excessive because, among other things, the invoices reflect work responding to the SEC inquiry without reference to the restatement.

In response to those critiques, SAEX has curtailed the amount requested substantially, and now seeks reimbursement for only six invoices that specifically reference the firm's work on the

restatement (Invoice Nos. 96511; 96814; 96881; 97046; 97106; and 98876).  The Court has reviewed each of those invoices and concludes that SAE has proven that the amount claimed was necessary.

    c.  **Legal Fees**

        *i.  Legal Fees Incurred Responding to Requests from the Government*

SAEX's initial request for reimbursement of its legal costs was monumentally excessive.  In presenting the request, counsel for SAEX completely disregarded the rule established in *Lagos*.  As described above, in *Lagos*, the Court concluded that the MVRA "does not cover the costs of a private investigation that the victim chooses on its own to conduct." *Lagos*, 38 S. Ct. at 1690.  "Just as a victim cannot recover expenses incurred during participation in 'a private investigation that [it] chooses on its own to conduct,' even if that investigation ultimately helps the government's, it should not be able to recover other expenses it 'chooses on its own' to incur, even if they later become part of its participation in the prosecution." *United States v. Razzouk*, No. 11-CR-430 (ARR), 2021 WL 1422693, at *4 (E.D.N.Y. Apr. 15, 2021) (internal citations omitted).  This rule was well established at the time that SAEX presented its initial request for the reimbursement of legal fees, yet the company attempted to recover $3,303,240.89 in legal expenses, which it represented to the Court to reflect "tasks and activities within this matter that were undertaken by SAE's attorneys in response to Government requests related to the investigation and prosecution of this case . . . ." Dkt. No. 105 at 6 (emphasis added).  That unsworn representation to the Court does not appear to have been true.

The Court's initial review of the billing records initially presented by counsel for SAEX revealed that many of the legal fees for which SAEX was seeking reimbursement could not reasonably be considered to be responses to Government requests.  Merely as an example, the company requested reimbursement of legal fees for presentations to its own board of directors.  The billing records also contained references to a substantial amount of other work that was not

responsive to requests by the Government.  That was apparent to the Court even before the United States submitted the Government Affidavit.

Just as one example among the very many:  the company included in its request for reimbursement time billed by two billers on the first day for which time was billed—October 10, 2019, the day that the Government first reached out to the company.  Those entries read "Review and analyze data from XXXX; perform QC review of contract attorney coding for responsiveness and privilege" and "Second level review document for production; note significant documents in review for inclusion in XXXX chronology."[6]  Sidley billed $6,901 for those two entries and asked that the Court order Mr. Hastings to pay for that work.  Assuming that "QC" stood for quality control, and knowing that counsel was conducting "second level" document review, the Court could tell from the very first entries in their billing records that SAEX was requesting reimbursement for work that it had begun before any request from the Government.  And, sure enough, those entries were completely eliminated when the Company pared down its requests.

Moreover, the time records initially submitted by SAEX contained numerous block entries that did not permit the Court to determine what percentage of the time worked could reasonably be determined to have been necessary to respond to an inquiry from the government.  Again, SAEX's counsel realized by the time of its supplemental submissions that billing time for work that was not at the request of the Government was inappropriate.  But SAEX's failure to address this obvious issue with its submissions in its reply, even in the face of the reasonable concerns articulated in Mr. Hastings' opposition is noteworthy.  It required a Court conference—and the bumpers established by the Government Affidavit ordered by the Court—for SAEX to begin the basic work of limiting its request to the reimbursement of fees permitted by the statute.

The supplemental application submitted by SAEX is substantially pared down.  However,

---

[6] The XXXXs represent redactions in the billing records provided to the Court.

the concerns articulated by Mr. Hastings with the application remain valid:  the company's block

billing makes it difficult for the Court to ascertain what portion of block billed time entries are

properly compensable under the MVRA and which are not.

"Block billing refers to a single time entry that includes a variety of distinct tasks." *Ass'n of*

*Holocaust Victims for Restitution of Artwork & Masterpieces v. Bank Austria Creditanstalt AG*, No. 04 CIV.

3600 (SWK), 2005 WL 3099592, at *5 (S.D.N.Y. Nov. 17, 2005).  "Block billing makes it difficult

for the court to allocate time to individual activities in order to gauge the reasonableness of time

expended on each activity." *Id.*  "Block billing is 'not prohibited in this Circuit as long as the Court

can determine the reasonableness of the work performed,' and 'billing descriptions that are fairly

general, including terms such as 'case preparation' or 'meeting' may be sufficiently concrete, when

viewed in context, to permit the court to make a judgment about the reasonableness of the total

hours claimed.'" *Abdell v. City of New York*, No. 05-CV-8453 RJS, 2015 WL 898974, at *4 (S.D.N.Y.

Mar. 2, 2015) (Sullivan, J.) (quoting *Zimmerman v. Portfolio Recovery Assocs., LLC*, No. 09–cv–4602

(PGG), 2013 WL 6508813, at *11 (S.D.N.Y. Dec. 12, 2013)).  "The standards, consistent with the

purposes of the MVRA, require only reasonable estimates arrived at by a preponderance of the

evidence.  A fortiori, absolute precision is not required." *United States v. Ageloff*, 809 F. Supp. 2d 89,

104 (E.D.N.Y. 2011), *aff'd sub nom. United States v. Catoggio*, 698 F.3d 64 (2d Cir. 2012).

SAEX has proven that the bulk of the legal fees that they seek are compensable as

restitution.  The Court accepts the company's proffer that those time entries that have been

designated in Exhibit 14 as work directly responsive to Government requests are accurate.

However, the company has not proven by a preponderance of the evidence what percentage of

block billed entries should properly be attributable to work requested by the United States.[7]

---

[7]  The records also contain other unexplained and unsupported modifications.  For example, Exhibits 14C and 14F
reference a 50% discount for "tasks including SEC component."  But there is no substantiation for the amount of that
proposed discount.  The Court has no way to know that 50% is the appropriate decrement for such tasks.  It may be

The Court recognizes that, as described above, the Court need only find a "reasonable estimate" of the amount of restitution. But at the same time, the company bears the burden of proof by a preponderance of the evidence that the amount claimed is proper. Here, SAEX has chosen to provide no affidavits in support of its application: neither to support the amount claimed, nor that would permit the Court to conclude that its methodology would result in a reasonable estimate of the amount spent in response to the Government's requests.

On its face, the approach that SAEX has taken to apportion these costs is somewhat arbitrary. It is certainly not accurate. Imagine hypothetically a time entry that read "Read email from DOJ about criminal case; reviewed documents for production to SEC," for which the company's lawyer billed $6,000. Using the company's approach ($6,000 divided by two—the number of discrete tasks identified in the billing narrative), the cost of reading an email would be $3,000—an absurd overestimate. This is a hypothetical, not an example, but it illustrates the evident flaws in the approach used by counsel for SAEX. Unfortunately, lacking affidavits to explain the methodology or to provide more detail regarding the billing records, the Court does not have enough information to conclude that the approach used by SAEX yields a reasonable estimate of the amount of work performed on matters that are covered by the MVRA. As a result, the Court does not conclude that the amount claimed by SAEX with respect to block billed entries are properly compensable under the MVRA. Some portion of that time may be compensable, but the records presented by SAEX are insufficient for the Court to reasonably estimate the amount of time that is compensable. The choice by counsel for SAEX not to provide such affidavits to support its application, like their decision to block bill their time to multiple tasks knowing the standard for

that such work was predominantly for purposes of responding to the SEC. Lacking affidavits supporting its calculation from the company, the Court does not have a basis to conclude that the 50% decrement is anything but arbitrary. Exhibit 14C contains a March 3, 2020 entry billing the company, and thus Mr. Hastings, for $8,855.00 for "Travel to New York; review and revise presentation; review and revise talking points," but the billing value for the full narrative is $4,427.50, over $4,000 less than the amount claimed.

restitution established under *Lagos*, is curious: it leaves the Court forced to guess at what whether the amount requested represents a reasonable estimate of the amount expended—a guess, however, is not proof.

The Court has reviewed the billing records and, deducting entries that have multiple categorical descriptions, concludes that the company is entitled to reimbursement of $229,454.74 in legal fees for responding to the Government's requests.[8]

### ii.   *Legal Fees Incurred Applying for Restitution*

SAEX is entitled to restitution in the amount of $123,587.55, representing the costs associated with its application for restitution. SAEX has proven that it incurred these amounts pursuing restitution. The Court appreciates the reasoning behind Mr. Hastings' request that the Court reduce that amount by 25%: the amount of time expended on the restitution application was greatly increased by SAEX's overreaching first request for reimbursement of legal fees, as well as its block billing practices. However, the company has proven that it did incur this amount of fees, and the victim should not be required to bear these incremental costs, which were directly and proximately caused by Mr. Hastings' offense.

### d.   **Joint and Several Liability**

Mr. Hastings is jointly and severally liable for the full amount of the restitution award. Mr. Hastings asks that the Court apportion the award between him and his two co-defendants. The Court understands that the three conspired to commit the offenses against the company; they are properly held liable for the losses incurred by the company jointly and severally. Apportionment in

---

[8] The Court does not believe that an additional decrement to this amount is appropriate to reflect any time that counsel for SAEX spent responding to requests related to Mr. Whiteley's independent crime for two reasons. First, the Court's reduction in the attorneys' fees requested has the practical effect of leaving the company uncompensated for some legal fees the amount of which they failed to prove. Second, as described in the Government Affidavit, the Government did not differentiate in its requests between the presentation regarding Mr. Hastings and Mr. Whiteley's separate crimes. The Government's requests were provoked by Mr. Hastings' crimes, as opposed to Mr. Whiteley's. As a result, again, Mr. Hastings' crimes can be viewed as the proximate cause for the request.

the manner requested by Mr. Hastings reduces the likelihood that the company will be fully compensated in the event that any one of the defendants is unable to cover his apportioned share of the restitution amount.  The company should not bear that risk.

## V.      CONCLUSION

Accordingly, the Court hereby orders that Mr. Hastings pay restitution in the amount of $7,363,129.34 to SAEX.  This liability is joint and several with his co-defendants.  The Court will issue an amended judgment consistent with this determination.

SO ORDERED.

Dated:  May 31, 2022
New York, New York

_____
GREGORY H. WOODS
United States District Judge